# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| **SAMANTHA HOLDREN, individually and on behalf of similarly situated persons,** | |
| **Plaintiffs,** | **CIVIL ACTION FILE NO.:** |
| | **_____** |
| **vs.** | |
| **TROP, INC., D/B/A PINK PONY, and TERRI GALARDI,** | **FLSA COLLECTIVE ACTION** |
| **Defendants.** | **JURY DEMAND** |

## COMPLAINT

COMES NOW Plaintiff SAMANTHA HOLDREN, individually and on behalf of similarly situated persons, and by and through her attorney, files her Complaint for violation of the minimum wage, overtime and tip provisions of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, as amended by the Tip Credit Protection Act of 2018, 29 U.S.C. § 203 (hereafter "FLSA") against Defendants TROP, INC. D/B/A PINK PONY, and TERRI GALARDI and shows:

## INTRODUCTION

1.     Plaintiff SAMANTHA HOLDREN and the collective action members are current or former entertainers of Defendants who were misclassified as independent contractors by Defendants and deprived of their rights to be paid the minimum and overtime wages and retain their earned tips under the FLSA. They seek recovery of their lost minimum and overtime wages and tips, an equal amount in liquidated damages and reasonable attorneys' fees and costs incurred as a result of Defendants' unlawful activities.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 because this action arises under the FLSA.

3.     Venue is proper in this District because all or a substantial portion of the events forming the basis of this action occurred in this District. Defendants' club is located in this District and Plaintiff and the collective action members worked in this District.

## PARTIES

4.     Plaintiff SAMANTHA HOLDREN a/k/a "Rosie" ("Holdren") is a former employee of Defendants, having been employed from 2007 through the present.

5.     The collective action members are current or former entertainers who were employed by Defendants as entertainers during the past three (3) years.

6.     Defendant TROP, INC. d/b/a Pink Pony ("Pink Pony") is a Georgia Corporation with its principal place of business located at 1837 Corporate Boulevard, NE Brookhaven, Georgia 30329. At all times mentioned herein, Pink Pony was an "employer" of Plaintiff and the collective action members within the meaning of the FLSA.

7.     Defendant TERRI GALARDI ("Galardi") is the owner and an employee, officer and director of Pink Pony. Galardi acted directly or indirectly on behalf of Pink Pony with respect to Plaintiffs and collective action members' compensation and other terms and conditions of their employment, and, at all times mentioned herein was an "employer" or joint employer of Plaintiff and the collective action members within the meaning of the FLSA.

## COMMON FACTUAL ALLEGATIONS

8.     During the three years prior to the filing of this complaint (hereinafter "the relevant time period") Defendants owned and operated the Pink Pony, an Atlanta, Georgia, nightclub featuring nude female dancers (hereinafter "the Club").

9.      Plaintiff and the collective action members are current and former adult entertainers employed by Defendants at the Club during the relevant time period.

10.     The Club hires entertainers to dance partially or fully nude at the Pink Pony Club.

11.     Pink Pony's entertainers typically dance for Pink Pony's customers on stage or tableside or in private VIP rooms.

12.     Pink Pony does not pay any wages to its entertainers.

13.     Instead Pink Pony's entertainers are compensated entirely by Pink Pony's customers in the form of tips.

14.     Pink Pony classifies its entertainers as independent contractors.

### A.      Employment/Joint Employment.

15.     At all times during the Relevant time period, Galardi was the owner, officer, and director and involved in the day-to-day operation of the Club.

16.     Galardi is the sole owner of Pink Pony, Goldrush and Onyx Club in Atlanta, and several other cubs in South Carolina, Florida and Nevada.

17.     Galardi manages and operates all of these clubs out of her corporate office in Atlanta, Georgia.

18.    All of the Galardi owned clubs operate under the same business model insofar as the clubs misclassify the entertainers at the clubs as independent contractors, take their tips in violation of the FLSA and TIPA and fail to pay them wages required by the FLSA.

19.    During the relevant time period, Galardi made significant decisions affecting the employment and compensation of Plaintiffs and the collective action members, including (i) the decision to misclassify Plaintiffs and other dancers as independent contractors rather than employees; (ii) to not pay them the minimum wage required by the FLSA; (iii) to not pay them the overtime wage required by the FLSA; and (iv) to seize their tips in violation of TIPA and the FLSA.

20.    In fact, Galardi and others have testified under oath that she was the only person affiliated with Pink Pony and the other clubs vested with the authority to classify entertainers as employees and change their compensation structure to comply with the FLSA.

**B.    Collateral Estoppel**.

21.    The Pink Pony club has been the subject of at least one adverse arbitration decision which was confirmed by the Superior Court of Cobb County, Georgia, finding (i) Pink Pony's entertainers are employees subject to the FLSA's

protections, (ii) the Pink Pony willfully violated the FLSA; and (ii) Pink Pony

failed to act in good faith or reasonably (the "Arbitration Decision").

22.    The Arbitration Decision is entitled to the same judicial affect as a

decision rendered by this Court. Consequently, the Pink Pony is collaterally

estopped from re-litigating in this forum the issues previously litigated in the

Arbitration Decision.

### C.    Interstate Commerce.

23.    At all times during the relevant time period, the Club was an

"enterprise engaged in commerce or in the production of goods for commerce" as

defined in the FLSA.

24.    At all times during the relevant time period, the Club was an

enterprise engaging in interstate commerce by having multiple employees regularly

selling alcoholic beverages produced and shipped from outside of the State of

Georgia, regularly serving foods produced and shipped from outside of the State of

Georgia, and having multiple employees regularly processing out-of-state credit

card sales in the furtherance of its business.

25.    During 2015, 2016, 2017 and 2018, the Pink Pony had an annual

gross volume of sales made or business done of not less than $500,000 (exclusive

of excise taxes at the retail level that are separately stated) within the meaning of 29 U.S.C. § 203(s)(1)(A).

26.     At all times during the relevant time period, the Club had two or more "employees handling, selling or otherwise working on goods or materials that have been moved in or produced for commerce by any person," as defined in the FLSA.

### D.     Degree of Control.

27.     The Club exercised a significant degree of control over the work of entertainers at the Club.

28.     At all times during the Relevant Time Period, the Club maintained and enforced written rules of conduct for dancers.

29.     Each entertainer was provided with a copy of Pink Pony's rules when hired.

30.     Pink Pony's house mom's go over the rules and Club's expectations with each entertainer when she is hired.

31.     The duties of Club management included ensuring that dancers complied with Club rules and policies.

32.     The Club required each entertainer to perform all work on its premises, and provided the customers, building, sound systems, stages, VIP rooms,

music, lighting, support staff, alcohol, food, and other facilities and personnel necessary for an entertainer to dance for a living.

33.     The Club provided the location, building and facilities for each entertainer to work and earn her living.

34.     Each entertainer was forbidden to leave with a customer, take a customer home or date a customer.

35.     At work, each entertainer was managed and supervised by the Club's managers, house moms and floormen.

36.     The Club directly and indirectly controlled dancers' work schedules by requiring them to work a minimum number of shifts per week and hours per shift.

37.     The schedules were determined at the time of hiring by Pink Pony.

38.     Prior to starting employment with Pink Pony, entertainers are given a schedule.

39.     Each entertainer is advised in writing that they "will have expected performance days that they will be needed to work."

40.     Entertainers are required to obtain permission from management or a house mom to miss a scheduled shift.

41.    Entertainers are notified in writing that they "will be subject to appropriate discipline for no call/no shows."

42.    The discipline for a no call/no show may include suspension or termination.

43.    Entertainers are expected to arrive on time for a scheduled shift or pay a fine in the form of an increased house fee to work that shift.

44.    If an entertainer arrives after a certain time, she is forbidden to work at all that shift.

45.    During a shift, an entertainer may not leave the premises without permission of management or a house mom.

46.    During shifts entertainers are required to dance stage sets when called to the stage by Pink Pony's disc jockey ("DJ").

47.    The Club's DJ at times give entertainers' instructions to remove clothing while on stage.

48.    The Club's DJ's call entertainers to dance on stage on a set rotation established by the dancers' time of arrival.

49.    "All entertainers are responsible to dance each and every song on each of their stage sets" or pay another dancer a minimum of $10 to dance for them.

50.     Entertainers may be fined for missing a stage set.

51.     Pink Pony's entertainers are required to stay on stage until their replacement arrives.

52.     If a replacement does not arrive the entertainers must remain on stage and dance until an entertainer does arrive to replace her.

53.     Pink Pony has and enforces rules about how an entertainer may dance while on stage, the floor and VIP rooms.

54.     Typically, each entertainer will dance a stage set at least every hour unless there are a large number of entertainers working that shift.

55.     Pink Pony's entertainers must dress completely before leaving the stage.

56.     Pink Pony does not permit its entertainers to walk around the club "partially of fully naked."

57.     The Club's house moms and managers evaluate the appearance and dress of dancers at the Club.

58.     Pink Pony enforces strict dress and appearance requirements consistent with the image they wish to maintain for their entertainers.

59.    Each entertainer is expected to wear a costume to work complying with Pink Pony standards.

60.    Pink Pony's entertainers must wear a garter, break away bottoms, and high heels as part of the costume, and a butt cover when walking about the Club.

61.    Each entertainer is expected to "have their hair done, nails and toenails painted, make-up on and costumes clean and in good condition."

62.    The Club's house moms and managers have the authority to require dancers to change their appearance and attire at work.

63.    On occasion during the relevant time period, the Club's house moms and managers required dancers to change their appearance and attire at work.

64.    During the relevant time period, the Club's managers had the authority to suspend and discipline dancers.

65.    During the relevant time period, the Club's managers supervised dancers on a day-today basis.

66.    At times during the relevant time period, the Club required dancers to attend meetings.

67.    At times during the relevant time period, the Club used mandatory dancer meetings to discuss problems with dancer dress, hair, makeup, weight, and appearance, Club promotional efforts and other work related issues.

68.    At times during the relevant time period, the Club's managers and house moms suspended and disciplined entertainers for violation of Pink Pony's rules.

### E.    Relative Investment/Opportunity for Profit and Loss.

69.    During the relevant time period, the Club paid all costs associated with advertising, marketing, and promoting the Club.

70.    The Club rents or owns the property on which the Club is located.

71.    During the relevant time period, the Club paid all costs associated with running and operating the Club.

72.    At all times mentioned herein, each entertainer was dependent entirely upon the Club's customers to compensate her for working at the Club.

73.    The Club's customers are derived from the Club's advertising and marketing efforts and the Club's reputation from operating the Pink Pony for many years.

74.    The Club required Club customers to pay a "door fee" to enter the business.

75.    The Club had ultimate authority as to which individuals were allowed to enter the Club as customers.

76.    At all times during the relevant time period, the Club's managers and house moms had the discretion not to permit a dancer to work on the premises.

77.    At all times during the Relevant Time Period, the Club enforced a mandatory check-out process for the Club's dancers, which included the payment of various fees to the Club and its managers, house moms, and DJs.

78.    Pink Pony provided and maintained all stages used for dancer performances at the Club.

79.    The Club provided all poles used for dancer performances at the Club.

80.    The Club provided VIP rooms for entertainers' use with customers.

81.    The Club provided the floor and tables at which its entertainers danced.

82.    The Club provided the sound system, lighting and music used by entertainers to dance at work.

83.    The Club provided food and alcohol for its customers.

84.     At all times during the relevant time period, the Club was responsible for day-to-day purchases of liquor and food for sale at the Club.

85.     The Club makes substantial profits from its operations.

86.     An entertainers' ability to increase her earnings is largely based upon her looks and working harder or longer hours.

### F.     Skill and Experience.

87.     At all times during the relevant time period, the Club did not require the Club's dancers to have prior experience as dancers or any formal or special training.

88.     At all times during the relevant time period, when an individual wanted to work as a dancer at the Club, a house mom and/or manager generally performed a "body check" to determine if the individual's body was suitable for performing at the Club.

89.     An entertainer is hired by Pink Pony largely because of her "appearance" and willingness to take off her clothes in front of others.

### G.     Duration and Exclusivity.

90.     Pink Pony's entertainers are hired indefinitely like most employees.

91.     The indefiniteness of the employment of entertainers is more indicative of an employment relationship, than an independent contractor relationship.

92.     At the time of hiring, Pink Pony hopes the entertainer will work for Pink Pony for a significant duration.

93.     Plaintiff Holdren worked for Pink Pony for over ten (10) years.

94.     Many of the collective action members worked for the Pink Pony for a year or longer.

**H.     Pink Pony's Nude Dancers Are Integral to Pink Pony's Operations.**

95.     At times during the Relevant Time Period, the Club advertised its business using pictures of scantily clad women.

96.     The Pink Pony is well known as a "strip club," "gentlemen's club" or an "adult entertainment club."

97.     Pink Pony's customers frequent the Club to watch nude dancing.

98.     The presence of nude dancers was and is integral to the Club's business success and operations.

**I.     Other Relevant Allegations.**

99.    Plaintiff and the collective action members were and are economically dependent on the compensation they received from working at the Pink Pony.

100.   At all times during the Relevant Time Period, Plaintiff and the collective action members were or are "employees" as that term is used in the FLSA, rather than independent contractors, as a matter of economic reality.

101.   At all times during the Relevant Time Period, Defendants were or are "employers" of Plaintiffs and the collective action members as defined in the FLSA.

102.   At all times during the Relevant Time Period, Plaintiffs and the collective action members were and are not exempt from the minimum wage requirements of the FLSA.

### J.    **Liability and Damages**.

103.   At all times during the relevant time period, Defendants paid no wages to Plaintiff and the collective action members for any work time on the premises.

104.   Plaintiff and the collective action members generally worked at least seven hours per shift at least three (3) days per week at the Pink Pony.

105.   On occasion, Plaintiff and the collective action members worked over forty (40) hours in a workweek.

106.   In addition, Plaintiffs and the collective action members were required to do their hair, nails, toenails, make-up and bathe and dress for each shift to comply with Pink Pony's policies and procedures.

107.   The time spent by each entertainer complying with Pink Pony's appearance and dress requirements typically exceeded one (1) hour per shift.

108.   At the end of each night shift, each entertainer was required to wait for Pink Pony's customers to exit the Club and parking lot before she was allowed to leave the Pink Pony premise.

109.   Typically, each entertainer was required to wait 20 minutes to an hour each night shift to comply with Pink Pony's waiting policies.

110.   Pink Pony did not pay any wages to Plaintiffs and the collective action members for the time spent working on the premises, getting ready for work and waiting to leave the premises after work.

111.   Plaintiffs and the collective action members worked entirely for tips paid by Pink Pony's customers.

112.   The tip compensation was paid directly by the customer to Plaintiffs and the collective action members unless the tip was paid through a customer's credit card.

113.   Plaintiffs and the collective action members were required to pay Pink Pony and others to work at the Club.

114.   The required payments to the Club and others were paid entirely from the tip income earned by Plaintiffs and the collective action members.

115.   Plaintiffs and the collective action members were required to pay from their tips a house fee of at least $41 per shift to work at Pink Pony.

116.   The house fee increased if Plaintiffs or the collective action members arrived after the start of the scheduled shift.

117.   Plaintiffs and the collective action members were required to pay the greater of 10% or $10 from their tips to the Disc Jockey each shift.

118.   Plaintiffs and the collective action members were notified in writing at the time of their hiring that "DJ fee is 10% of your gross tips. The minimum fee is $10.00."

119.   Pink Pony requires the DJ to "kick-back" a portion of the fees paid by the entertainers to the DJ back to the Club.

120.   If a Pink Pony customer paid Plaintiffs and collective action members by credit card, Pink Pony required Plaintiffs and the collective action members to "kick-back" to Pink Pony a fee of 15% of their tips from credit card charges.

121.   In addition, Pink Pony often withheld tips derived from credit card charges for up to 90 days or longer, thereby violating the FLSA requirement that tips earned during a workweek be paid during the employees regularly scheduled pay period.

122.   The various fees charged Plaintiffs and the collective members violate the free and clear requirement of the FLSA, and constitute an illegal "kick-back" under the FLSA.

123.   The various fees charged by Pink Pony to Plaintiffs and the collective action members caused their wages to drop below the minimum wage and the applicable overtime wage during workweeks in which Plaintiffs and the collective action members worked overtime.

### K.   Defendants' Knowledge

124.   The Galardi owned clubs have repeatedly been sued for the exact same FLSA violations alleged in this lawsuit.

125.   In several of these lawsuits, the Court determined as a matter of law that the entertainers employed by the Galardi owned clubs are employees subject to the protection of the FLSA.

126.   Additionally, Pink Pony The Pink Pony club has been the subject of at least one adverse arbitration decision which was confirmed by the Superior Court of Cobb County, Georgia, finding (i) Pink Pony's entertainers are employees subject to the FLSA's protections, (ii) the Pink Pony willfully violated the FLSA; and (ii) Pink Pony failed to act in good faith or reasonably (the "Arbitration Decision").

127.   Upon information and belief, Pink Pony received legal advice notifying Pink Pony that its misclassification and compensation schemes at the Pink Pony and other clubs violated the FLSA.

128.   Pink Pony has known for many years that its misclassification and compensation schemes at the Pink Pony and other clubs violated the FLSA, but has continued to operate unlawfully because it has been more profitable to continue violating the law than complying with the FLSA.

## **COLLECTIVE ACTION ALLEGATIONS**

129.   Plaintiff re-alleges and incorporates by reference the above paragraphs as if fully set forth herein.

130.   Pink Pony maintained a policy and practice of (i) misclassifying its entertainers; (ii) requiring them to pay to work as described herein; (iii) withholding of tip income; and (iii) not paying them the minimum and overtime wage required by law.

131.   Pink Ponies unlawful policies and procedures were applied to all entertainers working for Pink Pony during the past three (3) years.

132.   Like the Collective Action Plaintiffs, there are members of the putative Collective action who are or were subject to the same FLSA violations and who wish to join this lawsuit. These individuals would benefit from the issuance of court-supervised notice of this lawsuit and the opportunity to join by filing their written consent. Defendant can readily identify these similarly situated entertainers through its business records and produce their contact information to Plaintiffs' counsel.

133.   The putative class includes:

All entertainers who were employed by Pink Pony as entertainers during the past three (3) years.

## COUNT ONE
## VIOLATION OF 29 U.S.C. §§ 206

134.   Paragraphs 1 through 102 are incorporated herein by this reference.

135.   At all times material hereto, Plaintiff and the collective action members were or are employees covered by the FLSA and entitled to the minimum wage protections set forth in FLSA, 29 U.S.C. § 206(a).

136.   At all times material hereto, Defendants failed to compensate Plaintiff and the collective action members at an hourly rate above or equal to the minimum wage.

137.   Plaintiff consents to sue in this action pursuant to 29 U.S.C. § 216(b).

138.   A consent to sue executed by each Plaintiff is attached to this demand.

139.   Plaintiff and the collective action members are entitled to payment of their minimum wages in an amount to be determined at trial, in accordance with FLSA § 16(b), 29 U.S.C. § 216(b).

140.   Defendants' requirement that Plaintiff and each collective action member pay fees and fines to the Club and its managers, house moms, and DJs

violated and continue to violate the "free and clear" requirement of 29 CFR 531.35, thereby constituting an unlawful kickback in violation of the FLSA.

141.   As a result of Defendants' willful underpayment of minimum wages as alleged above, Plaintiff and the collective action members are entitled to liquidated damages in accordance with FLSA §16(b), 29 U.S.C. § 216(b).

142.   As a result of its underpayment of minimum wages as alleged above, Defendants are jointly and severally liable to Plaintiff and the collective action members for their litigation costs, including their reasonable attorney's fees, in accordance with FLSA §16(b), 29 U.S.C. § 216(b).

## COUNT II
## OVERTIME WAGE CLAIM (Violation of 29 U.S.C. § 207)

143.   Plaintiff repeats and realleges the allegations in the preceding paragraphs of this Complaint, and incorporate the same herein by this specific reference.

144.   Each Defendant is an "employer" or joint employer of Plaintiffs and each collective action member within the meaning of the FLSA, 29 U.S.C. § 203(d).

145.   Plaintiff consents to sue in this action pursuant to 29 U.S.C. § 216(b).

145.   A consent to sue executed by each Plaintiff is attached to this demand.

146.   Defendants failed to pay Plaintiff  and all others similarly situated the applicable overtime wage for each hour in excess of forty (40) during each workweek in which they worked in violation of 29 U.S.C. § 207.

147.   Based upon the conduct alleged herein, Defendants knowingly, intentionally and willfully violated the FLSA by not paying Plaintiff and the collective action members the overtime wage required under the FLSA.

148.   Throughout the relevant period of this lawsuit, there is no evidence that Defendants' conduct that gave rise to this action was in good faith and based on reasonable grounds. In fact, Defendants continued to violate the FLSA long after it learned that its misclassification scheme and compensation policies were illegal.

149.   Due to Defendants' FLSA violations, Plaintiff and the collective action members are entitled to recover from Defendants, overtime wage compensation and an equal amount in the form of liquidated damages, as well as reasonable attorneys' fees and costs of the action, including interest, pursuant to 29 U.S.C. § 216(b).

## COUNT III
## UNLAWFUL TAKING OF TIPS (Violation of 29 U.S.C. § 203)

150.   Plaintiff repeats and realleges the allegations in the preceding paragraphs of this Complaint, and incorporate the same herein by this specific reference.

151.   Each Defendant is an "employer" or joint employer of Plaintiff and each collective action member within the meaning of the FLSA, 29 U.S.C. § 203(d).

152.   Defendants are engaged in "commerce" and/or in the production of "goods" for "commerce" as those terms are defined in the FLSA.

153.   Defendants operate an enterprise engaged in commerce within the meaning of the FLSA, 29 U.S.C. § 203(s)(1), because it has employees engaged in commerce, and because its annual gross volume of sales made is more than $500,000.

154.   Plaintiff consents to sue in this action pursuant to 29 U.S.C. § 216(b).

155.   A consent to sue executed by each Plaintiff is attached to this demand.

156.   Under TIPA:

> [a]n employer may not keep tips received by its employees for any purpose including allowing managers or supervisors to keep any portion of employees' tips, regardless of whether or

not it takes a tip credit.

29 U.S.C. § 203.

157.   Defendants kept a portion of tips paid to Plaintiff and the collective action members by Defendants' customers in the form of house fees, G-Buck fees and payments to the house moms, DJ and floormen in violation of TIPA.

158.   As a result of Defendants willful violation of TIPA, Plaintiff and the collective action members are entitled to recover, under the FLSA and TIPA, all tips kept by the employer, any tip credit claimed by Defendants, an equal amount in liquidated damages and attorneys' fees.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully pray that this Court grant relief as follows:

a.   Certify this as a collective action and issue notice to collective action members;

b.   As to Count I award Plaintiffs and the collective action members judgment for wages at the minimum rate, including the recovery of all payments reducing wages below the minimum wage, as well as

liquidated damages, interest and attorneys' fees as provided for under the FLSA;

c.     As to Count II award Plaintiffs and each collective action member who joins this lawsuit judgment for overtime wages, including the recovery of all payments reducing wages below the overtime wage, as well as liquidated damages in an equal amount, interest and attorneys' fees as provided for under the FLSA;

d.     As to Count III award Plaintiffs and each collective action member who joins this lawsuit judgment for the recovery of all tips kept by the employer, the amount of any tip credit claimed by Defendants, an equal amount in liquidated damages and reasonable attorneys; fees under the FLSA and TIPA;

e.     Award Plaintiff costs of this action, including expert fees;

f.     Grant Plaintiffs and the collective action members a jury trial on all issues so triable; and

g.     Award Plaintiff such other and further relief as the Court may deem just and proper.

_**/s/Ainsworth G. Dudley**_
Ainsworth G. Dudley
Georgia Bar No. 237215

4200 Northside Parkway, 1 – 200
Atlanta, Georgia 30327
Tel. 404.237.2150
adudleylaw@gmail.com